The specific error that we would assign to the summary dismissal of our case in Anthony is quite narrow and quite simple. We were asked to participate in a summary judgment proceeding in which one issue and one issue alone was asked to be addressed by all parties, and that is how Pohl affected the continued vitality of the Anthony case. And specifically, we entered into a stipulation that Mr. Anthony has had a single LPT that was negative and is not, in fact, beryllium-sensitized. We entered into that stipulation. And we did so out of a recognition that a legal determination had to be made whether some class representative, in this case this individual, could possibly proceed on a claim for monitoring in the absence of a hard diagnosis of beryllium sensitization. That's what Pohl posits. And so Judge Gardner allowed us to conduct discovery on that narrow point, and we did, which is to say we got certain documents from Brush-Wellman on their monitoring program because we thought that was germane to establishing when we say risk attachments. And I also took the deposition of the one and only expert declarant that the defendants produced, Dr. Repsher. And in Dr. Repsher's deposition, he conceded having absolutely no knowledge or information about the plant that Mr. Anthony worked in, the kind of exposures he had, the kind of exposure, no idea. He simply stated that somebody who doesn't have beryllium sensitization is not at a significant risk. That was his opinion. Our experts, by contrast, said, wait a minute, that's not the way it works. Risk attaches before sensitization occurs, and laid out all of the risk analysis, frankly, that you've already heard about in the context of Sheridan and Zimmerman. What Judge Gardner did, however, was to dismiss the opinions of our experts, choosing instead to credit only the opinions of the defense expert, Dr. Repsher, on the basis that we produced no exposure data, that we didn't show how much beryllium was. And we specifically, in our summary judgment response, said we weren't given an opportunity to do that, because we were presented with only a narrow legal question, and that is whether one has to be beryllium sensitized before monitoring can even be available as a remedy. So the specific assignment of error in the Anthony case is that if you read, as we read, Judge Gardner's opinion dismissing our expert views out of hand and choosing to side with Dr. Repsher of the defense because we lacked exposure data, then I think that is a clear instance of error in which the plaintiff should be permitted, if in fact that was the turning issue for the district court, should be permitted to go back and and duration to match our burden of showing significant risk. Of course, that's not what Pohl would say. Well, Pohl doesn't really go to that issue. Pohl took exposure with nothing more right out of the case, didn't he? I don't think that's what it says, Judge Barrow. I think what it says is that we failed to meet the equivalent Rule 23 requirements for certification, and the expert proofs for the three individuals was wholly inadequate to demonstrate that they were at a risk. And I have to candidly concede because in 03, when those experts were asked to put declarations together, we didn't have the understanding about the science that we have now. But that's not the question that Anthony begs. The question that Anthony begs is if you assume that Judge Gardner was correct, that there isn't an immutable positive rule of law that says you have to be beryllium-sensitized, that is have two positive LPTs, then you get back to, I think, the purity of redlands, which is how do you show significant risk? Now, here's our position. Our experts have come in to Anthony and said, we know a huge amount of what machinists are at risk for who work with beryllium. Here's what we know. They put together, frankly, brilliant declarations, and the defendants put in their declaration by Dr. Repture who said, no, no, no, no, no. There's no risk there. There's no significant risk until you get to BES. To me, that is exactly what the 11th Circuit was faced in Parker in which one set of experts said one thing and another set of experts said another. That presents a question of fact that can only be determined by the jury. I asked myself in reading Judge Gardner's opinion, why then did he come down as he did? And his language is very plain. One doesn't have to analyze it. It says, I am dismissing the opinions of plaintiff's experts as conclusory because it lacks exposure data. Now, I have to accept that as true, and if that's true, then the relief I'm seeking from this Court is that the case be remanded for further proceeding so that we can put in exposure data that supports our expert's opinion because we were never given the right or opportunity to do so. And I say that to you because the only issue we were asked to conduct discovery on was the legal issue framed by poll. It had nothing to do with exposure data. It had nothing to do with duration. We had no discovery from the plant operators. Remember, in Anthony, the plant operators are not party defendants. They're not in the case. So we were unable, to the point that the case was dismissed, to take any discovery from them. Had we known that Judge Gardner was going to throw out our expert views because we lacked exposure data from the plant, we would have gotten it. We would have had an inspection of the plant. Did the defendants ever raise the factual matter of no exposure data in their motion for summary judgment? That's a very good point, Chief Judge Sirica. They did not. They relied in Anthony exactly as they did in Sheridan. They said, poll stands for the proposition that if somebody doesn't have beryllium sensitization, that is, two positive LPTs, you have no legal recourse. That's their argument. And that's what we briefed. And it, frankly, shocked us to see in the Court's opinion, when it got to a discussion and analysis of our expert views, which is that there is significant risk, that those opinions were dismissed because we didn't have exposure data. And we argued in our, I think, reply papers that, had we known that, we would have requested and, in fact, requested then an opportunity to put that exposure data in and never had an opportunity to do so. So if Judge Gardner's decision truly turns on the failure of proofs on the basis that we didn't have that data, the relief we're asking of the Third Circuit is to be permitted to go back and develop that and resubmit declarations that are amply supported by exposure data that we know exists because machinists are, have for decades been studied and understood to be at very high, very significant risks of disease. The DOE knows this. OSHA knows this. Brush-Wellman knows this. This is why, for more than 20 years, Brush-Wellman has been testing its own machinists who work with this material. What are the, is the number that we're talking about here? In terms of percentage? Of machinists. No, no, of machinists. How many people? I think there's under 1,000 all shifts, all times. So it's in the high hundreds as we understand it. But bear in mind, Chief Judge Sirica, that we had no discovery on that issue, too. We knew, we know that it certainly meets the numerosity requirement, but it's nothing like a one-mile radius of a residential community or anything like that. It's quite a defined, well-known, identifiable class. And so on that narrow point, we would, we would ask respectfully for an opportunity to, to develop that if, in fact, our reading of Judge Gardner's opinion comports with this, with this appellate court's reading. Thank you. And I'll reserve a few minutes of rebuttal. Thank you. Mr. Ubersax. Good morning. Yes, good morning or afternoon, if we're there yet. My name is Jeff Ubersax. I represent Brush-Wellman, Inc. Let me start by briefly responding to the assertion that Judge Gardner dismissed or threw out the plaintiff's experts in Anthony. In fact, a review of his opinion makes clear that he paid very careful attention to their declarations. He cited them extensively in his opinion, and he noted their agreement with Dr. Repscher on all material points. He said Dr. Repscher was unchallenged on the facts that were material to summary judgment. As for discovery, it's clear that the plaintiffs had every opportunity to take discovery if they wanted their experts to offer opinions about Mr. Anthony's risk in this particular work setting. They didn't do that. Instead, they chose, for their own reasons, to offer only conclusory opinions about a whole population, unsupported by any facts or evidence. Did you raise that in your summary judgment motion? Did we raise... The point that you just mentioned. Well, our point was that none of the elements of Redlands have been satisfied. We didn't get into the circumstances of the exposure because plaintiffs didn't address it. And they could have done so. The facts were that after the motion for summary judgment was filed... I don't think... Do you really... Plaintiffs didn't address exposure. That's really what they've been addressing throughout. They didn't address Mr. Anthony's exposure. They didn't say anything about his exposure. And this case is, after all, about Mr. Anthony. And does he have a risk? We know that, in fact, we know from what Mr. Honig said this morning that he does not have a risk. He admitted in response to one of your questions that one cannot contract chronic beryllium disease without having beryllium sensitization. Well, he's not sensitized. I mean, we know that. He's not sensitized. Therefore, he cannot develop chronic beryllium disease. He clearly is not at significant risk under the Redland case, as interpreted in the Pohl case. And really, the question here is, is there any persuasive reason why this court shouldn't follow Pohl and the many cases, the 31 other cases that have gone the same way as Pohl in the Pennsylvania courts? The argument that Mr. Honig makes is that there is new science since Pohl. So we now understand that there is some kind of process. Now, that argument is just that. It's an argument. There's no support for it in the record and it's wrong on the law. The record, the supposed... Dr. Glaser only... I mean, is there any evidence that beryllium sensitization will inevitably or always lead to chronic beryllium disease in some kind of process? There's no evidence of that. All that Dr. Glaser himself said, all he ventures to say is that studies to date suggest, quote, they suggest that a, quote, majority of sensitized persons will develop CBD. Now, that is no different from what the court said in Pohl. The court said in Pohl that the evidence was that approximately half will progress. And if you look at the declaration of Dr. Glaser here, he refers to only one study on progression. And that's a study. He only tells the court one thing about that study. What he tells the court is that 8% of the people progressed. Well, he doesn't cite the study. He doesn't identify it. It appears to be the same study that was put before the state courts in the Schlott and the Anastasio cases. And the state court said this doesn't change anything. It also appears to be the same study that the Fifth Circuit considered in the Paz decision. We've heard a lot of talk about Parker. We've heard nothing about Paz. And the court there identified it as Newman 1. The Fifth Circuit noted that in that study only that fully 69% of the sensitized persons did not develop CBD. And the Fifth Circuit concluded that it would be conjecture. It would be speculation to assert that beryllium sensitization leads to chronic beryllium disease. So there's no factual premise. What about Dr. Finkel's testimony? Dr. Finkel doesn't say anything about the rate of progression from sensitization to chronic beryllium disease. He doesn't support this argument. And all the experts, really the important percentage on which all the experts agree. Well, Dr. Finkel, he wanted, he says, who obtains beryllium specific exposure data from the U.S. Gauge facility, but based on comparable data from similar populations, he says, he suggests that the class was exposed in a way that significantly increased risk for CBD by all recognized benchmarks was present. So that's not true. Well, that's something. You can't say he didn't say anything. I mean, I think that's something. Well, he didn't say anything about this question of how many sensitized persons progressed to CBD. He did offer this conclusion. But that isn't what his particular area of expertise was. I agree. I agree. That's why he didn't say it. Right. Right. Well, I'm just addressing Mr. Honig's argument that there is some new science on this notion of a process. And I'm saying that science doesn't exist. That is what he is using as the basis for the argument that the Court shouldn't follow Pohl because things have changed. Pohl will decide it. The science has changed. There's something new. In fact, there is nothing new. There's no new study. And the Court in Pohl, like the plaintiff's experts here, said that about half, maybe a majority of people will progress. That is nothing new. So not only is there no factual premise for this argument, it's also wrong on the law. Because as Redlin says, monitoring, compulsory monitoring is available only for a serious latent disease. Beryllium sensitization is not a serious latent disease. The argument plaintiffs make is essentially that you should monitor for sensitization. In fact, the experts are express about that. They say monitor for sensitization. But sensitization is asymptomatic. It's not a disease. It causes no impairment. And it's clear from this Court's own – this other Sheridan decision that sensitization is not an injury. You had there a plaintiff who was both sensitized and diagnosed with chronic Beryllium disease and was found to have no injury. Yeah, but if someone's diagnosed with CBD, there's no question they were sensitized, right? Correct. No question at all. You cannot have CBD without being sensitized. That's right. That's inherent in the nature of the disease. And that is – So that Mr. Honig is correct. It would be very nice if there could be some test that would test for a susceptibility to sensitization and get it even before – find out at an earlier date. There is no such test. I suppose that's probably – I think I'm confusing terms. I think one is or is not sensitized. It's not a susceptibility to becoming sensitized. So I withdraw that comment. One is or is not sensitized. And of course, the fact here is that Mr. Anthony is not. And again, there was a direct question this morning – Well, he could have another test and it could be positive. He could. And the Court, of course, left the door open for that. It said he can come back and if he's positive, things will be different. It's been since 2006 when this case was filed. And Mr. Anthony has not come forward with any additional evidence of sensitization. So the record remains that he is not sensitized. And as Mr. Honig – Is there any impediment for Mr. Anthony or somebody in his circumstance to later on bring a claim for medical monitoring? That is, is there any statute of limitations, problems at this point? There is no impediment, as the trial court said. If he does later come forward with proof that he is now sensitized, it would be different and that would start a statute running. Or otherwise has a significantly increased risk of developing CBD? If there were some new technology or new test, I think that's what Judge Gardner probably had in mind. And I think – And perhaps Pohl. And perhaps Pohl. I mean, one could imagine if there were perhaps a genetic test and an ability to find a marker that was associated with almost a guarantee of chronic wheeling disease from even the most minimal exposure, but there's no science like that. Well, it wouldn't be a guarantee, not a guarantee, but it would be a guarantee that you would have this – you would be susceptible and that you might then have – you might contract it. I don't think you could expect anything more than that in a preliminary test. Am I correct in that or not? It is, of course, hypothetical, but it's conceivable that there could be a – could be some kind of genetic test which, if positive, would mean that that person, from even the most minimal exposure, would have a very high likelihood of contracting chronic wheeling disease or probability of developing it. Without sensitization that – No, no, you would still – You would still have to be sensitive. You would still have to have the sensitization. Yeah, that's the – that's one of the problems. I mean, that's just inherent in the disease mechanism. And let's be clear on that. I – you know, the – So that even if there's a genetic marker that could be developed to – That would go to the – You would still have to be sensitive anyway. You always have to be sensitized. What we're talking about is not a substitute for sensitization in the disease mechanism, but a different form of proof. I mean, could there someday be a form of proof of increased risk other than sensitization? That's the possibility that Judge Gardner left open, but it doesn't exist today. To get the disease, you still have to be sensitized. And, you know, Dr. Glaser explains that in his own declaration. He says – he says, basically, if you're not allergic, you can't get the disease. And his words are, once this response occurs, once sensitization occurs, and only then your immune system can recognize and attack beryllium particles in the lung. That can cause inflammation. It can cause granulomas. But unless you have that previous immune response, that sensitization, the disease just can't – it can't occur. You don't have those specially programmed white blood cells that recognize beryllium and say, that's the enemy, I'm going to attack it. And that causes inflammation. Now, the earlier sensitization is diagnosed or discovered, the earlier there can be treatment, if there are some clinical symptoms, I suppose, to treat. Or maybe – or does one treat the – the finding of sensitization? That's a good question, Judge. You're – there is no treatment for sensitization. There is also no treatment even for asymptomatic chronic beryllium disease. I mean, treatment is something – it's a rather – it's a late resort, only at the point where – But there's something that could conceivably be developed when there is a finding of sensitization and there are no symptoms or even asymptomatic CDN. One – a treatment could easily, I would think, be developed to anticipate the symptoms that would likely develop if one were to develop Well, there is no such treatment now. And – Start prednisone a little earlier. So – You know. That's only in advanced cases where the disease has reached a symptomatic point. And – Is there a way to – there may become a way to prevent the disease from becoming symptomatic. Can you prevent the granulomas from developing? You can perhaps minimize the effects of the granulomas. With anti-inflammatory drugs. Or control the inflammatory response. See, that's a much more elegant way of asking my question. That's why he's chief judge among a lot of other reasons. Yes. The understood mechanism is that prednisone can suppress inflammation. This is a way to respond to that. But all that, of course, comes only long after there's been a diagnosis. Not just a diagnosis of the disease, but a clinical diagnosis with symptoms and so on and so forth. We're talking about a plaintiff in this case who has no sensitization and therefore no risk of chronic beryllium disease at all. We know, I think, that Judge Barry asked the pointed question, how can chronic beryllium disease be contracted in the absence of beryllium sensitization? Which Mr. Honig properly admitted it cannot. And that really is the dispositive fact here. Mr. Anthony does not have beryllium sensitization and cannot develop chronic beryllium disease. Is Mr. Honig essentially saying that these machinists are in a different category from the residents nearby the plant? And there are studies that show that they're at increased risk. So why shouldn't they be treated differently from those in the prior case? Why shouldn't they? They shouldn't because the source of the exposure. Oops. Temporary network failure there. Why don't you hold on? If we can't get the video back, we can always get the audio. Sure, Patrick. Are we back? Not yet. Okay. Okay. It's us. Good. We're back in action. Good. Okay. Judge Smith, can you hear us? And thank you very much. Yes. Thank you. Chief Judge Chiricka, you'd asked me to address the distinction between occupational and residential exposure. And the source of the exposure is really immaterial because unless you have an immune response, as Dr. Glazer explains, neither an occupational nor a residential nor any other exposure can cause you to develop chronic Bruin disease. And I would also note that in the state court cases, at least three of the cases after a poll, the plaintiffs did have only occupational exposure. The Anastasio Court expressly considered that and rejected Mr. Honig's argument that it makes any difference. And that's the point I would make on that. Also, on the discovery point, which I haven't fully addressed, the record I think is clear that there was never any complaint to the trial court about a lack of discovery, that every request that the plaintiffs made for discovery was granted, and that in fact the plaintiffs stipulated with us after the case was argued to a stay of all further discovery. There was no 56F affidavit, no motion. Okay. And so the complaints about discovery really, I think, ring hollow here. Good. Let me ask my colleagues if they have any further questions. I just have one. Thank you. After reading the blue brief, I thought Bruce Wellman was supposed to get a medal. And so the wonderful things they volunteered to do, and I was surprised to see that the attorney for Bruce Wellman is arguing for 15 minutes. I still am not entirely clear of Bruce Wellman's involvement in this case, other than as a pretty tangential third-party defendant. But congratulations on being selected to carry the water here. We are a third-party defendant and the only domestic fully integrated producer of beryllium products. Is that an advertisement? No. What does that have to do with it? Thank you. But, you know, I guess part of Mr. Honig's argument was that Bruce Wellman has these programs. He talks extensively about them in his brief. And what I think is important about those is that they were, you know, obviously they were voluntarily adopted and they are surveillance programs that look for risk. There's a difference between looking for risk in your workforce and a remedy that's available in a lawsuit for a risk that's already become manifest. And that's, I think, a key distinction. What Bruce Wellman voluntarily does to look for risk in his workforce really has no bearing on what can be compelled into the Redland case. Again, it's the difference between looking for risk and risk that has been established. No risk has been established here in the case of Mr. Anthony. Good. Any further questions? Thank you very much, Mr. Ubersax. Mr. Wittges? Neil Wittges again for Cabot Corporation. The Pohl case assumed sufficient exposure. Indeed, there's reference in the trial court's opinion, which is quoted verbatim and at length in the Superior Court's opinion in what we've referred to as Poll 2, to occupational exposure levels, 131 micrograms per cubic meter in the 1950s in a certain area of the plant. So the Pohl case assumed adequate exposure to cause chronic beryllium disease, and the plaintiffs argued in Pohl that it's the same thing for the class of neighbors that there's monitoring there, the risks are the same. So the fact that we have a proposed class of workers and that Mr. Anthony's exposure is occupational is a difference without a meaning. Their claim is that any exposure above background or any exposure above a standard puts Mr. Anthony and the class he seeks to represent at risk. The class definition in the case for this, very similar to the Sheridan case, is anyone who worked at the beryllium plant, this plant, this U.S. Gage plant, for at least one month. And indeed, he talks about secretaries and security guards having risk, and the Pohl court addressed all that, and the Pohl court said in spite of all that, in spite of sufficient exposure, and we're assuming in the motion in Pohl and the motion here, and the motion in Sheridan, didn't challenge that aspect of Redland soccer. We assumed adequate exposure, but the Pohl court said, and what Judge Gardner and Judge Prater and Judge Tereshko in the state court in 31 cases said, is that assuming sufficient exposure, you still need sensitization to progress to CBD. What is the status in the superior court now of Judge Tereshko's cases? Appellant's briefs have been filed, and the appellee's briefs in those cases are due February 19. So it's still a ways off yet. And what's the normal waiting time before argument? You know, I'm really not sure. So we have the briefs due the 19th, and then the reply brief. Okay. There are 31, I'm sorry, 27 consolidated individual medical monitoring cases. These are not lengthy opinions, though, that require a lot of analysis in those 31 cases. Well, Judge, the way the state court works, it's a little different than the federal court. In the state court, the trial judge has the option of just entering an order. No, I'm not saying it was wrong. Right, but then Rule 1925, the appellate rule, says then write an opinion if it's appealed. I think it's a mechanism that tries to reduce the load of the trial court if it's not necessary. And there was an opinion recited to it. It's, I think, published in Lexis and Westlaw under the Anastasio caption. But just in terms of progression of the cases, so there are 27 cases that are consolidated, pure medical monitoring cases, alleging combinations of occupational take-home, that is spouses of workers, and ambient air exposure. Some of the cases allege solely occupational exposures. And then in addition to that, there were four or five separate cases that have multiple appeals. And there was an order entered, similar to the one here, that all of those cases would be argued sequentially. So I would suspect that whatever I would know about, and I don't, the average time, I think we might be a ways off from argument there. In addition, in the poll case, as here, there was a lot of argument about what the Department of Energy does under regulation. And, again, that's monitoring by regulation or the BELPT by regulation to workers. And, again, it was not just machines. It was anyone at any exposure. So I think the level of exposure becomes irrelevant in the plaintiff's analysis after you get over the threshold. And that's what they argued of what was relevant about the Faust case, is that the Faust case was PCBs, and the Faust case said on class certification, if an expert says exposure above a certain level puts everyone at risk, then that's sufficient. And that's what the experts have always argued here. However, I know and I acknowledge that Judge Gardner does, in his opinion, talk about the absence of evidence about the actual exposures in the U.S. Gauge plant. And I think Mr. Eubersacks has addressed that adequately. I don't need to add to that. But I think it really is a non-issue because their claim in all the science and all the evidence and all the expert reports is that there's not a greater risk at greater amounts of exposure. It's any exposure above a certain amount creates the risk. That's their conclusory opinion. But the science remains the same, that even at these very, very high exposures, unless you demonstrate the immune response first, you will not progress to CBD. You will not have a significantly increased risk of CBD. We understand your position on this. My colleagues have any other questions? Good. Mr. Wickes, thank you very much. Thank you, Your Honor. Mr. Hunter? I'll be brief on three or four points and sit down. There's a reason that the four appellants who were in the DeBeck Group in the decision that the late Chief Judge Becker wrote died. The reason they died, three of them before the appeal, one after, is because in the absence of early detection you get an overwhelming abundance of granuloma that kills you. Make no mistake that what we're talking about here is meaningful medical intervention, and that's why we've sought medical monitoring relief for these classes of at-risk persons, number one. The very polite, genteel term of screening versus monitoring is a difference without a distinction medically. When Brush-Whelman first undertook to look for disease in their own worker population, that's exactly what they were doing, and they called it monitoring. And it was not for another 10 or 15 years when the lawyers realized they were mimicking those states and those federal circuits that were embracing monitoring as a cause of action  Make no mistake about it. The record that you will have an opportunity to look at with care is about looking not for risk, as Mr. Eubersack suggested, but looking for disease. The reason Brush-Whelman, as an additional party not even joined by plaintiffs, was allotted 15 minutes, if you stop to consider it, is that as the world's largest integrated manufacturer, they are scared to death that jurisprudence will allow machining facilities like this one to monitor their people at their expense. Because although in this case they were brought in as an additional defendant, they're concerned that there may be future cases in which they will be financially responsible for their beryllium products having to monitor worker classes. And I say that to you with candor, but I say this to you. That is not and should not be a consideration of this court. That is a social and public policy and public health issue that's not before us. But make no mistake about why Brush-Whelman is here and what Brush-Whelman has been doing for decades. They are looking for disease, not risk. The risk is already present. Now, the Redland decision has seven standards to get the remedy. The first one says exposure greater than normal background levels. Exposure greater than normal background levels. I think it was Mr. Wittges who said that everyone assumed in these cases that that was present, except Judge Gardner didn't. Judge Gardner interjected exposure levels into his analysis of significant risk. That's why we didn't take discovery on it, because we assumed it. And if there's any question in this court's mind about what he said, one need only look at his language. He wrote, and I quote, a closer examination of the plaintiff's expert declaration, however, reveals that neither expert has the data necessary to support their conclusions in this regard, which are merely assumptions and speculation rather than opinions. Here's the key language. In other words, they do not have or base their opinions upon any beryllium-level readings, measurements, or other exposure data from the U.S. Gauge plant. That's the basis upon which he decided that our risk analysis was inadequate. If you read it as I read it, as the basis for his opinion and ultimate dismissal, I respectfully suggest that you must remand so that we can take discovery from non-party plant operators about what those levels were, if that's what was wanted. You sought an extension of time for further discovery and further discovery to respond to this time to respond to the defendant's summary. We did, Judge Barry. I think you specifically requested you wanted discovery on exposure levels, as I remember. That is absolutely incorrect, Judge Barry. We sought one thing and one thing only, and that was the opportunity to get Brushwellman documents on their monitoring program, number one, which we got. You got. And number two, the opportunity to depose Dr. Repsherd, their one expert. And in his own affidavit, this is what's stunning, he says, I have no idea what the exposure levels were, but I can tell you that Mr. Anthony is at risk. And so we have a double-edged sword here in which we were indeed granted an opportunity to conduct expert discovery on his risk analysis, but had no opportunity to take plant discovery about what the levels were. And had we known that Judge Gardner was going to consider not only Redland factor number four, about significantly increased risk, but also its connection to exposure levels, we would have pursued that but didn't. I'm looking for his March 10th order. I can't find it. I have it in the rubble someplace. There's no question the Court said take what you want. He said take what you want. He did. He did. And we took what we stipulated to was the only issue for summary judgment. The defense stood up and said, Judge, we think the case can be disposed of by your determining what poll means. Mr. Honig stipulates that Mr. Anthony is not fully insensitized, therefore decide the legal issue. And we agreed that was judicially economical. And we agreed to stay all other merits discovery and limit ourselves to that. But the whammy was, in Judge Gardner's opinion, he threw us out because we didn't have data. But is that really the basis of his decision? And the basis of his decision was a stipulated fact that there was no sensitization. Sensitization was required. Implicit in that, well, so we can't prove under poll that he has a sensitivity. If he had written an opinion that looked like Judge Prater's, I'd agree. But he doesn't. He mentions the word exposure there at one point. He'll never be able to prove, you know. Judge Barry, if you go back and read the language. But you have to have the sensitization regardless of the exposure. He doesn't say that. He says I'm going to look at every we need to look at every case on the facts and expert opinions as we have them here. Honig says the science has changed that risk attaches before sensitization. I'm going to analyze that. He says neither of his experts support their conclusions that risk attaches before with data. That's his ultimate opinion. Now, he himself at the end of his opinion says there's something anomalous about his opinion. In that, the very test that we're seeking that would tell us if you're on the disease progression, he's not permitting. He recognizes the anomaly of that. And I think that's what this appellate court has to grapple with. If Judge Prater's view prevails, then it doesn't make any difference. I agree. If you agree with Judge Prater that there is a positive rule of law in Poll that says for time immemorial, the only way a beryllium exposed individual in any setting ever gets, this is the defense, ever gets to get monitored at their expense is if you first demonstrate that you're sensitized, I'm out of court. Okay. Let me ask my colleagues any more questions. Judge Berry, Judge Smith. Thank you for your considerable attention. Thank you very much. The case was extremely well argued. Indeed. We will take the matter under advisement. It would be helpful to the court to have a transcript made of this argument. We would ask that you share the costs of preparing the transcript and that you check with the clerk's office before you leave the courthouse. They'll tell you how to effectuate that. Again, on behalf of the court, thank you very much. Judge Smith? Oops. Is it off? Judge Smith would- Yes. Give me a call in chambers when you have a chance. Thank you.